# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

WILLIAM BLEIGH,

    **Petitioner,**                                    **Case No. 2:11-cv-628**

  v.

**TIMOTHY BRUNSMAN, WARDEN,**       **JUDGE GEORGE C. SMITH**
**LEBANON CORRECTIONAL**            **Magistrate Judge Kemp**
**INSTITUTION,**

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, William Bleigh, a prisoner at the Lebanon Correctional Institution located in Lebanon, Ohio, filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. The case is now before the Court on the petition, the return of writ, petitioner's traverse, respondent's reply to petitioner's traverse, supplemental authority supporting petitioner's traverse, and the exhibits of the parties. For the following reasons, it will be recommended that the petition be denied.

## I. PROCEDURAL HISTORY

On September 26, 2008, petitioner was indicted in Delaware County, Ohio on charges of raping a minor, gross sexual imposition, pandering obscenity, and using a minor in nudity oriented material. He was accused of committing these acts on his daughter, and he entered a plea of not guilty on all counts. His case was tried to a jury, and on January 9, 2009 the jury returned guilty verdicts on all counts. Petitioner was convicted and sentenced to a total of 81 consecutive years of imprisonment.

Petitioner filed a timely appeal of his conviction and sentence to the Fifth District

Court of Appeals.  He raised eight assignments of error on appeal, as follows:

ASSIGNMENT OF ERROR # 1

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED BLEIGH'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY DENYING BLEIGH A CONTINUANCE AFTER HE EXPRESSED NO CONFIDENCE THAT HIS ATTORNEY WAS PREPARED FOR TRIAL.

ASSIGNMENT OF ERROR # 2

THE TRIAL COURT ERRED AND VIOLATED BLEIGH'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY PERMITTING THE PROSECUTION TO USE PRIOR CONSISTENT STATEMENTS FROM CM'S GRAND JURY TESTIMONY AND ADMITTING INTO EVIDENCE A TRANSCRIPT OF THAT TESTIMONY.

ASSIGNMENT OF ERROR # 3

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED BLEIGH'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY ADMITTING INTO EVIDENCE THE VIDEO RECORDING OF THE CAC INTERVIEW.

ASSIGNMENT OF ERROR # 4

THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED BLEIGH'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY PERMITTING THE LEAD DETECTIVE TO GIVE HIS OPINION THAT THE GENITALS VISIBLE IN THE PHOTOS OF CM WERE BLEIGH'S GENITALS.

ASSIGNMENT OF ERROR # 5

THE TRIAL COURT ERRED AND VIOLATED BLEIGH'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS BY ADMITTING THE OPINIONS OF CM'S SCHOOL PRINCIPAL AND THERAPIST THAT CM WAS TELLING THE TRUTH.

ASSIGNMENT OF ERROR # 6

BLEIGH WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

ASSIGNMENT OF ERROR # 7

THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS IN THIS TRIAL VIOLATED BLEIGH'S STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO A FAIR TRIAL.

ASSIGNMENT OF ERROR # 8

THE TRIAL COURT UNLAWFULLY IMPOSED SENTENCE ON COUNTS THAT WERE TO BE MERGED.

In an opinion issued on March 22, 2010, the court of appeals overruled the first seven assignments of error, and sustained the eighth. In doing so, it upheld the jury verdicts and remanded the case to the trial court to revisit the entry of conviction and sentence. *State v. Bleigh*, Fifth Dist. No. 09-CAA-03-0031, 2010 Ohio 1182, 2010 WL 1076253, at ¶¶ 2-38 (Ohio Ct. App. May 22, 2010). On May 10, 2010, the trial court entered an Amended Judgment Entry on Sentence Pursuant to Remand.

On March 7, 2011, petitioner, acting *pro se*, filed with the Ohio Supreme Court a notice of appeal from his direct appeal and a motion for delayed appeal. On April 20, 2011, the Ohio Supreme Court denied the motion for delayed appeal and dismissed the case.

## II. THE FACTS

The facts of this case were summarized by the state court of appeals, in its Opinion of March 22, 2010, as follows. As noted below, this Court must accept those facts as accurate for purposes of this proceeding.

> Appellant has four children: a 15-year-old son (CB), a 13-year-old daughter (CM, the victim), an 11-year-old daughter (AB), and a 5-year-old daughter.[1] CB and AB have the same mother, while CM has a different mother. Appellant also considered CM's younger brother to be his, although he is not actually Appellant's biological son.
>
> [1] For purposes of anonymity, initials designate the minor

children's names. See, e.g., *In re C.C., Franklin App. No. 07-AP-993, 2008 Ohio 2803 at P 1, n.1.* Counsel has adhered to *Rule 45(D) of the Rules of Supt. for Courts of Ohio* concerning disclosure of personal identifiers.

For the first seven years of CM's life, she lived with her mother in various locations, including outside Ohio. Appellant did not meet CM until she was five, when her mother sued for paternity and child support. When CM was seven, her mother moved back to Ohio, and Appellant began visiting her every other weekend. After living in Ohio for a short time, CM's mother decided to move to Louisiana. Appellant begged her to stay or leave CM behind, but CM's mother refused.

Approximately one year later, CM's mother returned. CM's mother, CM, and her younger brother moved in with a friend and several other people; however, they were unable to reside there for any substantial period of time. CM's mother asked Appellant to take both children and signed guardianship papers granting him temporary custody of them. At the time, Appellant lived on South Henry Street.

CM's mother had a few brief visits with the children, but disappeared for several months. Appellant was granted permanent custody of CM, but was not able to get permanent custody of her younger brother because there was no biological connection. CM's mother was granted visitation.

In February 2006, Appellant's family moved to Richards Drive, where they stayed until August 2007. After Richards Drive, CM and Appellant moved into the Delaware Hotel for a short time. CB and AB joined them at the hotel. According to CM, Appellant did not actually stay at the hotel, but was there regularly to take them to school, make sure they had food and clothes, and make sure they were doing their homework and not fighting. The children enjoyed playing at the pool and playing with other children who were there with their families.

They were only at the hotel a couple days before they moved into a house on Liberty Street, along with Max and Beth Muir, and their eight-year old son. Appellant and Max both worked in the IT[2] department at Pacer International. Appellant and CB stayed in rooms downstairs, while the Muirs had one room upstairs, their son had a second room, and CM and AB had a third.

[2] Information Technology.

CM complained that Appellant was strict and unfair with his punishments. She disagreed a lot with the way he punished her and her siblings. Appellant admitted that he was a strict disciplinarian, but tried to be fair. Appellant tried to make sure the children had chores to teach them responsibility. Appellant testified that his parenting philosophy was different from that of CM's mother, who was much less strict.

1. CM's Initial Report.

CM had a friend named Karma, whom she met in the sixth grade. Karma told CM and another friend that her father was abusing her. Karma also told the school principal, who called children services. As a result, Karma was placed in foster care.

On March 26, 2008, CM told Karma and the same friend that her father was also abusing her. Karma thought CM was playing at first, but said that CM had been acting as she acted when it was happening to her. According to CM, Karma then told the principal, who called CM into the office. On the date she disclosed these crimes to her intermediate school principal, Heidi Kegley, CM was twelve years old and a student in the sixth grade.

The school principal testified during Appellant's jury trial that CM approached her and asked to come to her office to talk. CM told the principal that she had helped a friend, and asked if she could help her, too. CM then began to disclose information about Appellant and his bedroom. The principal stopped her, contacted children services, and waited for them to arrive.

When children services arrived, CM provided more details. CM said that Appellant was looking at pornography on the internet in his bedroom, had her sit on his lap, and touched her legs in a manner that she felt was inappropriate. She slapped his hand and made him stop. Appellant asked her to perform oral sex and she did. When she wanted to stop, he masturbated until he ejaculated on the carpet. Afterwards, Appellant told her to lie on the bed and take off her shirt, and then he put a rag on her head. [**6] She did not recall what happened after that. CM also indicated that Appellant occasionally asked to take pictures of her without her clothes. CM indicated that this occurred at a time when the girls had lice.

At some point, after CM disclosed the abuse but while he was still at his place of employment, Appellant became aware that the children were at the

Delaware Police Department. According to his own testimony at trial, he stopped at home to brush his teeth prior to driving to the police station. Appellant testified that during this time, he also entered the bedroom where his camera was located. Eventually, Appellant arrived at the police station and was interviewed by Detective Justin Herring.

While Detective Herning was interviewing Appellant, officers were executing a search warrant at the residence. Officers collected multiple computers and related equipment, a bag of clothing, several disposable cameras and various evidentiary items from the residence. Officers also collected an Optimus digital camera with an SD card[3] inside. During the initial search of the residence, Sergeant John Radabaugh photographed the closet of the Appellant's bedroom. Sergeant Radabaugh noticed and photographed the black lingerie, thigh-highs and black heels in the back corner of the closet in the Appellant's bedroom. At the time, he was unaware of the relevance of these items to this case and did not seize them or place them into evidence.

> [3] Short for Secure Digital card, a solid-state memory card used in digital cameras, phones and other mobile devices. These memory cards are used to store data or pictures and are removable.

2. CAC Interview and the subsequent search warrants.

On April 1, 2008, CM was interviewed at Nationwide Children's Hospital Children's Advocacy Center ("CAC"). The CAC interview was recorded on DVD and played for the jury. CM disclosed that Appellant made her watch pornography. CM disclosed that he would rub her back and proceed to touch her genitals; and she disclosed that Appellant would then ask her to perform oral sex. CM further described how Appellant would offer her money to do these things; she disclosed that his penis went in her vagina; and she disclosed that on at least one occasion, she became physically ill and had to throw up. CM disclosed that Appellant made her dress up in a black thong, black thigh-highs and black heels and he took pictures of her in his bedroom. CM further described how she felt a "scar" on Appellant's genitals with her tongue when she performed fellatio. CM further stated that Appellant told her he had been "fixed".

The physical exam performed at CAC was normal and revealed that CM's hymen was intact. The doctor testified that that does not rule out sexual

activity because there is often little penetration or any damage is healed. CM had no physical signs of sexual abuse, and reported no symptoms or signs typical of such abuse, like bed-wetting, anal bleeding, or behavioral changes. CM was also free of sexually transmitted diseases.

Based on this information, the Delaware Police Department obtained two additional search warrants, one for the residence to obtain the black thong, lingerie and additional clothing found in the closet of the Appellant's bedroom and one for photographs of the Appellant's genitalia. On April 1, 2008, S.A.N.E.[4] nurse Heather Crosbie executed the search warrant, and with Detective Herning present, photographed Appellant's genitalia. Ms. Crosbie noted linear discoloration, consistent with scarring, on both sides of Appellant's scrotum. Ms. Crosbie also identified a "midline ridge" which ran along the underside of Appellant's penis.

[4] Sexual Assault Nurse Examiner.

CM testified during Appellant's jury trial that Appellant had her wear the high heel shoes, the lace top, and the black thong underwear. CM further testified that on another occasion, Appellant came into the bathroom and attempted to anally rape her. CM testified that Appellant touched her breast and her vagina with his mouth in his bedroom. CM further testified that Appellant did this too many times for her to count. CM testified that Appellant made her perform oral sex on him in the bathroom and made her "taste it when he spermed." CM testified that Appellant made her perform oral sex on him and more specifically testified, "it felt like the further I tried to keep my tongue away from it, the more he felt like he moved it down my throat." CM testified that Appellant asked her to use her mouth on his penis in the bedroom "several times. Too many for me to count." CM further testified that in another incident involving fellatio Appellant offered her $200 "to keep it in there while everything was coming out."

CM testified at length about the "scar" that she felt with her tongue during these incidents and specifically identified what was actually the "midline ridge" that S.A.N.E. nurse Heather Crosbie photographed on Appellant's genitalia.

Linda Cox, CM's therapist, testified at trial that CM had disclosed the abuse she suffered at the hands of Appellant and that CM suffers from post-traumatic stress disorder. CM disclosed the sexual abuse to the counselor, and also claimed physical abuse. CM had a hard time focusing during

sessions. She was moody, depressed, and felt isolated, all of which was consistent with PTSD. CM was having nightmares, flashbacks, and thoughts of incest. For a month or so, she also had suicidal ideations and wrote about wanting to kill herself. Although CM felt that she had memories of what happened, the counselor testified that you do not know what you can or cannot remember with PTSD. The counselor indicated that new memories may surface, but admitted that PTSD could produce false memories.

3. Photographs.

CM testified that she had not seen the photographs where Appellant posed her in the black lingerie and black heels since Appellant had originally created them. However, CM was able to testify at trial in detail as to the lingerie Appellant made her wear and the position he forced her to assume on the bed prior to reviewing the photographs.

CM testified that when she was wearing sparkly jeans, Appellant took some pictures of her. Appellant had her take off her clothes and change into a thong, and put on some black lipstick. Appellant put his penis in her mouth and kept taking pictures. Appellant also posed her on the bed. During this incident, Appellant touched her breast, pulled down her pants, and put his penis in her vagina.

At trial, CM was able to identify herself and Appellant in each of the photographs depicting fellatio. Further, she was able to identify herself in the photographs where Appellant directed her to undress, put on the lingerie and pose on his bed. CM was able to identify the thong, thigh-highs and black heels found in Appellant's closet as those she was wearing in the photographs.

Although he stated differing reasons for doing so, Appellant did admit that he put the thigh-highs, black heels and black thong underwear in a bag in the back of his closet. Both CM and Appellant identified the dresser, the bed and the bedroom of Appellant in the photographs. CM specifically testified that her father created each photograph contained in State's Exhibits 45-61.

The photographs of CM performing fellatio on Appellant's genitalia show shaved pubic hair and discoloration on the scrotum indicating vasectomy scars consistent with the photographs taken by S.A.N.E. nurse Heather Crosbie. Appellant admitted that he shaved his pubic hair in statements to Detective Herring while the photographs were being taken. Appellant

admitted at trial that he had a vasectomy and specifically identified the scarring in the photographs taken by S.A.N.E. nurse Heather Crosbie.

All of the photographs depicting CM were recovered from the Digital Camera, which was taken from the Appellant's bedroom during the execution of the first search warrant. Paul Hogan, a co-worker of Appellant testified that an overwhelming majority of the other photographs contained on the Digital Camera were taken at Pacer International where both Mr. Hogan and Appellant worked. Mr. Hogan further testified that the photographs appearing just prior to the photographs of CM in the thumbnails were taken during a business trip to San Jose that he took with the Appellant and several other employees on or about February 10, 2008. Appellant admitted that he owned the digital camera from which the photographs were recovered.

4. The Defense.

Appellant testified in his own defense and denied everything. Appellant believed CM was lying so that she could go back to living with her mother. They had argued about that for a few years, and CM resented the fact that he had custody. CM did not like his discipline or chores, and complained that her mother did not make her do them.

Concerning the high heel shoes found in his closet, Appellant testified that when CM got good grades he offered to take her shopping. She said she wanted to buy high heels for dances or other formal occasions. He allowed it, but only if they were relatively tasteful and she could actually walk in them.

With respect to the other clothing, Appellant testified he bought the thigh-highs and the lace panties for his girlfriend. The thong and the boy shorts he claimed he confiscated from CM when he saw them in her laundry basket. When he confronted her about them, she would not say where she got them.

Appellant testified he was not surprise [sic] by the photos of CM because he discovered them in early 2008 when he was going through photos from a business trip. He found photos depicting CM and a male in various poses and states of undress, engaging in various sex acts. Appellant claimed he confronted CM, who did not want to answer, but eventually admitted that she had been having sex with her older half-brother, CB.

Appellant did not tell anyone about the photos. He searched the other

computers to see if there were more and claimed he found some on CB's laptop. Appellant wiped the laptop and used a file shredder to erase the camera.

Appellant claimed that he had caught CM and CB together in the past. When they lived on Richards Drive, Appellant testified he caught them in the bathroom mostly naked. Appellant claims he told them they should not be doing things like that. Appellant contended he did not tell anyone about this prior to trial because he was trying to protect CB.

CB was called as a rebuttal witness and denied having sex with CM or taking pictures of her. CB admitted that he shaved his pubic hair, but denied that his genitals were in the photos.

*State v. Bleigh*, Fifth Dist. No. 09-CAA-03-0031, 2010 Ohio 1182, 2010 WL 1076253, at ¶¶ 2-38 (Ohio Ct. App. May 22, 2010).

## III. PETITIONER'S HABEAS CLAIMS

Petitioner filed his habeas corpus petition in this Court on July 20, 2011. In his petition, he raised the following eight claims:

**Ground One:** The trial court abused its discretion and violated Bleigh's state and federal rights by denying him a continuance after he expressed no confidence that his attorney was prepared for trial.

**Ground Two:** The trial court erred by permitting the prosecution to use prior consistent statements from the alleged victim's grand jury testimony and admitting into evidence a transcript of that testimony.

**Ground Three:** The trial court abused its discretion by permitting the lead detective to give his opinion that the genitals visible in photos were that of the defendant.

**Ground Four:** The trial court erred by admitting into evidence the video recording of the CAC interview.

**Ground Five**: The trial court erred by admitting the opinions of the alleged victim's school principal and therapist that the alleged victim was being truthful.

**Ground Six:** The Defendant was denied his state and federal constitutional right to the effective assistance of counsel.

**Ground Seven:** The cumulative effect of the numerous errors in the trial violated the Defendant's right to a fair trial.

**Ground Eight:** The trial court unlawfully imposed sentence on counts that were to be merged.

It is respondent's position that all eight of petitioner's grounds for relief have been procedurally defaulted, and that this default cannot be excused on grounds of ineffective assistance of counsel.

## IV. PROCEDURAL DEFAULT

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required to present those claims to the state courts for consideration. 28 U.S.C. §2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982)(per curiam); *Picard v. Connor*, 404 U.S. 270, 275-76 (1971). But if, because of a procedural default, the petitioner can no longer present his claims to the state courts, then he has also waived those claims for purposes of federal habeas corpus review, unless he can demonstrate both cause for the procedural default, as well as actual prejudice from the alleged constitutional error. *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is waived by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986). "First, the court

must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id*. Second, the Court must determine whether the state courts actually enforced the state procedural sanction. *Id*. Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim. *Id*. Finally, if the Court has determined that a state procedural rule was not complied with, and that the rule was an adequate and independent state ground, then the petitioner must demonstrate that there was cause for him not to follow the procedural rule, and that he was actually prejudiced by the alleged constitutional error. *Id*. This "cause and prejudice" analysis applies to failures to raise or preserve issues for review at the appellate level. *Leroy v. Marshall*, 757 F.2d 94 (6th Cir. 1985).

The first and second prongs of the *Maupin* analysis – the existence of a state procedural rule applicable to the petitioner's claim with which the petitioner failed to comply, and the state court's actual enforcement of the state procedural sanction – are satisfied here. Respondent's return of writ asserts that petitioner's claims are procedurally defaulted because the Supreme Court denied petitioner's motion for a delayed appeal pursuant to Rule of Practice of the Ohio Supreme Court II, Section 2(A)(1) and 2(A)(4). From March 22, 2010 when the Court of Appeals entered its decision through March 7, 2011 when petitioner filed his notice of appeal and motion for leave to file a delayed appeal, the Rules of Practice of the Ohio Supreme Court provided in relevant part the following:

> (1)(a) To perfect an appeal from a court of appeals to the Supreme Court, other than in a certified conflict case . . . the appellant shall file a notice of appeal in the Supreme Court within forty-five[1] days from the entry of the

---

[1]Prior to July 1, 2010, this rule used the number "45" rather than spelling out "forty-five."

12

judgment being appealed. The date the court of appeals filed its judgment entry for journalization with its clerk . . . shall be considered the date of entry of the judgment being appealed. . . .

(b) Except as provided in divisions (A)(2), (3), (4), (5), and (6)[2] of this rule, the time period designated in this rule for filing a notice of appeal and memorandum in support of jurisdiction is mandatory, and the appellant's failure to file within this time period shall divest the Supreme Court of jurisdiction to hear the appeal. . . .

(4)(a) In a felony case, when the time has expired for filing a notice of appeal in the Supreme Court, the appellant may seek to file a delayed appeal by filing a motion for delayed appeal and a notice of appeal. The motion shall state the date of entry of the judgment being appealed and the reasons[3] for the delay. Facts supporting the motion shall be set forth in an affidavit. A copy of the court of appeals opinion and the judgment of entry being appealed shall be attached to the motion.

(b) A memorandum in support of jurisdiction shall not be filed at the time a motion for delayed appeal is filed. If the Supreme Court grants a motion for delayed appeal, the appellant shall file a memorandum in support of jurisdiction within thirty[4] days after the motion for delayed appeal is granted. . . .

Ohio S. Ct. Prac. R. 2, §2.2(A)(1)(a), (1)(b), (4)(a), & (4)(b) (2010).[5]

Here, there is no dispute that petitioner failed to file an appeal to the Ohio Supreme Court within 45 days of the date of journalization of the decision of the appellate court, and there is no dispute that the Ohio Supreme Court denied petitioner's motion for delayed appeal. Petitioner argues that the Supreme Court of Ohio may have, or at least could have, decided his motion for leave to file a delayed appeal on the

---

[2]Subsections (5) and (6) were not added to this portion of the rule until July 1, 2010.

[3]Prior to July 1, 2010, this rule required the motion to state "adequate reasons for the delay" instead of "the reasons for the delay."

[4]Prior to July 1, 2010, this rule used the number "30" rather than spelling out "thirty."

[5]These Rules were amended again effective October 1, 2011, but the excerpt quoted here did not change with that amendment.

merits, because he was required to attach a copy of the decision being appealed to that motion. (Pet.'s Traverse at 2.) However, the Sixth Circuit has concluded that a denial of a motion for leave to file a delayed appeal is a procedural ruling rather than one on the merits. *Bonilla v. Hurley*, 370 F.3d 494, 497 (6th Cir. 2004). The court in *Bonilla* explained that the Rule regarding a motion for a delayed appeal does not require inclusion of the actual claims and supporting arguments sought to be presented on appeal. 370 F.3d at 497. Rather, it is only when the Ohio Supreme Court grants such a motion that the appellant must file a memorandum in support of jurisdiction. *Id*. at 497. "Thus, the applicable Ohio court rules indicate that the denial of a motion for a delayed appeal is a procedural ruling, not a ruling on the merits." *Id.; see also Walker v. Martin,* 131 S. Ct. 1120, 1128-29 (2011) (holding that the California Supreme Court's denial of a petition as untimely constituted a procedural default notwithstanding the fact that the court could, instead, review the petition and determine the petition was meritless, stating "[w]e see no reason to reject California's time bar simply because a court may opt to bypass the [timeliness] assessment and summarily dismiss a petition on the merits, if that is the easier path"). Accordingly, it is well-settled that when the Ohio Supreme Court denies a motion to file a delayed appeal, such as petitioner's motion here, it is enforcing a procedural rule.

Turning to the third prong of the *Maupin* analysis, "a federal court is generally barred from considering an issue of federal law arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Stone v. Moore*, 644 F.3d 342, 345 (6th Cir. 2011) (internal quotations and citations omitted). "To qualify as an 'adequate' procedural ground, a state rule must be "firmly established and regularly followed." *Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (citations omitted).

The Supreme Court has held that a "rule can be 'firmly established' and 'regularly followed,' . . . even if the appropriate exercise of discretion may permit consideration of a federal claim in some cases but not others." *Id.* at 1128 (internal quotations and citations omitted).

Petitioner argues that the Ohio Supreme Court Rule at issue here is not firmly established and regularly followed because it gives the court unfettered authority to grant or deny motions for delayed appeal, and it does not articulate its reasoning for why some such motions are granted and others denied. Both of these arguments are foreclosed by the Supreme Court's decision in *Walker*. 131 S. Ct. at 1128-29. The Court in *Walker* rejected the argument that the timeliness rule was too vague because it used "meaningless terms" like "reasonable time" and "substantial delay," instead concluding that "[i]ndeterminate language is typical of discretionary rules" and "[a]pplication of those rules in particular circumstances . . . can supply the requisite clarity." *Id.* at 1128. The Court went on to state that "[a] discretionary rule ought not to be disregarded automatically upon a showing of seeming inconsistencies. Discretion enables a court to home in on case-specific considerations and to avoid the harsh results that sometimes attend consistent application of an unyielding rule." *Id.* at 1130 (rejecting the Ninth Circuit's conclusion that the time bar was not consistently applied because outcomes under the rule varied from case to case, *i.e.*, in one case a one-year delay was found substantial while in another a fourteen-month delay was determined to be insubstantial). In addition, the *Walker* Court rejected the argument that it is "impossible to tell" why the state court enforces the time bar on some occasions and reaches the merits on others, concluding that the procedural bar at issue was adequate even though most of the state court's decisions to enforce the time bar were summary denials without explanation. *Id.* at 1129.

Petitioner also argues that the denial of his motion for a delayed appeal was not based upon an independent and adequate state-law ground because the rule at issue was not regularly followed, and in particular, this procedural bar is not applied in the vast majority of cases in which a motion to permit a delayed appeal has been filed. (Pet.'s Traverse at 2.)  As support for his argument, he cites to language in *Dugger v. Adams*, 489 U.S. 401, 410 n.6 (1989), also cited by respondent in the return of writ, to argue that a procedural rule is sufficient if the courts apply the rule "in the vast majority of cases."  (Respondent's Return of Writ at 15-16 *and* Petitioner's Traverse at 3.)  However, the *Dugger* Court did not hold that procedural rules *must* be applied in the vast majority of cases in order to be an adequate state law ground.  Instead, the Court in *Dugger*, by way of footnote, addresses the respondent's argument that the state court has failed to apply its procedural rule consistently and regularly.  Specifically, the respondent in *Dugger* argued that the state court addressed the merits in several cases raising the same claim as respondent on postconviction review.  In explaining its rejection of that argument, the Court stated:

> In the vast majority of cases, however, the Florida Supreme Court has faithfully applied its rule that claims not raised on direct appeal cannot be raised on postconviction review. . . .  Moreover, the few cases that respondent and the dissent cite as ignoring procedural defaults do not convince us that the Florida Supreme Court fails to apply its procedural rule regularly and consistently.

*Dugger*, 489 U.S. at 410 n.6.  While the frequency of application of the procedural bar was considered by the *Dugger* Court, it did not set forth a general rule regarding consistent and regular application.

Furthermore, *Dugger* involved a procedural rule that did not provide for the exercise of discretion and, therefore, one would have expected it to be applied all of the time, or at least in the vast majority of cases.  Following *Dugger*, the Supreme Court

specifically addressed the question of whether a state procedural rule is automatically "inadequate" under the adequate-state-grounds doctrine because the state rule is discretionary rather than mandatory, and the Court has answered that question "no." *Beard v. Kindler*, 130 S. Ct. 612, 615 (2009).

Finally, the type of research that petitioner presents here – evidence that on the day his motion for delayed appeal was decided, the Supreme Court of Ohio granted five requests for delayed appeal and denied two[6] – was considered by the Court in *Walker*, and the Court nonetheless found the rule to be an adequate and independent state-law ground. 131 S. Ct. at 1129 (citing to Brief for Habeas Corpus Resource Center as *Amicus Curiae* 20). In *Walker*, the procedural rule at issue was a time limitation on applications for postconviction (habeas corpus) relief that directed petitioners to file known claims "as promptly as the circumstances allow." *Walker*, 131 S. Ct. at 1124 (citations omitted). The state court would then either determine that the claims were untimely, or it would address them on the merits. *Id.* The Brief for the Habeas Corpus Resource Center as *Amicus Curiae* conducted an "empirical analysis of all habeas corpus cases that the California Supreme Court decided on September 11, 2002, the same day that court denied [the petitioner's] state habeas corpus petition." Brief *Amicus Curiae* of the Habeas Corpus Resource Center in Support of Respondent, No. 09-996, 2010 WL 4278489, at *16 (Oct. 27, 2010). *Amicus Curiae* determined that ninety-five cases were decided on the merits (*i.e.*, not decided on grounds that they were procedurally barred), and sixty-two cases were deemed procedurally defaulted. *Id.* at *18-19. Of the sixty-two procedurally defaulted cases, only twenty-two indicated that they were procedurally defaulted as the result of a timeliness bar. *Id.* at *20. *Amicus Curiae*

---

[6]Petitioner also cites to the number of motions for delayed appeal granted and denied on two other days. (Pet.'s Traverse at 2.) Those additional examples do not change the analysis.

determined that, although not specifically identified as such, it may be that as many of thirty-four cases out of one-hundred-fifty-seven were decided based on the state timeliness bar. *Id.* at \*21. Accordingly, the timeliness bar can hardly be said to have been applied in the vast majority of cases decided that day, and yet the *Walker* Court held that the timeliness bar was an adequate ground in that it was "firmly established and regularly followed." *Walker*, 131 S. Ct. at 1127, 1131 (citations omitted).

Following *Walker*, the issue in this situation is not how often a state court either grants or denies motions to pursue an appeal that is not timely filed. Rather, the relevant question is whether "discretion has been exercised to impose novel and unforeseeable requirements without fair or substantial support in prior state law . . . ." *Walker*, 131 S. Ct. at 1130 (internal citations and quotations omitted). However, as in *Walker*, *id.*, petitioner here does not contend that the state court exercised its discretion in a surprising or unfair manner, and there is no evidence that it did so. Thus, the Court finds that the Ohio Supreme Court's reliance on Supreme Court Rule 2 is an adequate and independent ground supporting its refusal to hear petitioner's direct appeal.

The fourth and final prong of the *Maupin* analysis – whether there was cause for petitioner not to follow the procedural rule and actual prejudice caused by the alleged constitutional error – does not excuse petitioner's procedural default. "In order to establish cause, a habeas corpus petitioner must show that 'some objective factor external to the defense' prevented the petitioner's compliance with a state procedural rule." *Bonilla*, 370 F.3d at 498 (citation omitted). Both cause and prejudice must be shown to excuse a procedural default. *Id.* at 497 (citation omitted).

Petitioner has argued that his default should be excused based on ineffective assistance of appellate counsel, because appellate counsel and the appellate court failed to inform him in a timely manner that there had been a ruling in his case, that he would

be required to file an appeal to the Ohio Supreme Court within 45 days, and that the sole responsibility for filing an appeal to the Ohio Supreme Court was his. (Pet.'s Traverse at 4-5.) "[I]gnorance of the law and procedural requirements for filing a timely notice of appeal is insufficient to establish cause to excuse [a] procedural default." *Bonilla*, 370 F.3d at 498. However, to the extent that petitioner did not know that there was a ruling in his case because his appellate counsel failed to promptly notify him of the state court of appeals' decision, that failure could constitute ineffective assistance of counsel sufficient to demonstrate cause for the procedural default. *Smith v. Ohio Department of Rehabilitation & Correction*, 463 F.3d 426, 432–35 (6th Cir. 2006).

Even though petitioner may be able to demonstrate cause if he can demonstrate that his appellate counsel did not promptly notify him of the court of appeals' decision, petitioner has failed to demonstrate prejudice. Where, as here, "a [petitioner] alleges that his counsel's ineffective assistance led to 'the forfeiture of a proceeding itself' . . . the [petitioner] must demonstrate that counsel's deficient performance 'actually cause[d] the forfeiture of the [petitioner's] appeal." *Smith*, 463 F.3d at 435 (internal citations and quotations omitted). The Sixth Circuit applies "a rebuttable presumption that if the period of time between when the defendant learned of the decision and when he or she attempted to appeal the decision is *greater* than the period allotted by state law for the timely filing of an appeal – here, forty-five days – the defendant fails to demonstrate that he or she 'would have timely appealed' the decision but for the counsel's deficient failure to notify the defendant of the decision." *Id.* at 435. Petitioner has made no attempt to demonstrate that he would have timely appealed the decision but for the counsel's failure. Nor does he contest respondent's argument that petitioner must have known of the resolution of the appeal, at the latest, when he was returned to the trial court for resentencing on May 10, 2010 following the resolution of the appeal.

(Resp.'s Return of Writ at 16.)  Following the May 10, 2010 hearing, petitioner waited until March 7, 2011, more than ten months later, to file his motion for delayed appeal. Accordingly, petitioner has failed to rebut the presumption that he would not have timely appealed even if counsel timely notified him of the state court of appeals' decision.

In addition, the *Smith* Court also recognized that "[a] claim of ineffective assistance of counsel must be presented to the state courts as an independent claim before it may be used to establish cause for procedural default."  463 F.3d at 436, n.7 (citations and internal quotations omitted).  Here, petitioner did not file an application to reopen his appeal under Ohio R. App. P. 26(B), which would have been the proper method of bringing an ineffective assistance of appellate counsel claim.  *See Id.*; *see also Arnold*, — F. Supp. 2d. —, 2011 WL 5553965, at *5.  Therefore, petitioner has procedurally defaulted his ineffective assistance of counsel claim and cannot present it here to demonstrate cause.

Beyond the four-part *Maupin* analysis, this Court is required to consider whether this is "an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  *Murray v. Carrier*, 477 U.S. at 491; *see also Sawyer v. Whitley*, 505 U.S. 333.  As petitioner acknowledges, (Pet.'s Traverse at 6), he has failed to meet this standard here.  Nor has petitioner made a showing sufficient to persuade the Court that it ought to appoint an expert analyst to examine the photographs of the genitals used in petitioner's trial.

Therefore, it will be recommended that petitioner's petition for habeas corpus be dismissed on procedural default grounds.

## V.  RECOMMENDED DISPOSITION

For all the foregoing reasons, the Magistrate Judge **RECOMMENDS** that

petitioner's claims be **DISMISSED**.  His motion to appoint counsel (Doc. 2) is **DENIED**.

## VI.  PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

/s/ Terence P. Kemp
United States Magistrate Judge